Case number 16-6655, USA versus Ricky Lanier and 16-6657, USA versus Katrina Lanier. Oral argument, 15 minutes per side. Mr. Little for the appellant. You may proceed. Good afternoon, your honors. Alex Little on behalf of appellants Ricky Lanier and Katrina Lanier. I please ask to reserve nine minutes for rebuttal. Yes. Thank you. Um, it is very rare that I come before a panel that knows a case and has seen a case longer than I have. So the court is very aware this case has been up to you now, I believe, the fourth time, once on direct appeal, two through, through emergency writs, and now on the appeal from the Rimmer hearing proceedings. Through that process, we think we've created a record which demonstrates that Juror 11 demonstrated the sort of behavior in which the court must imply bias. That repeatedly through the court hearings of the trial, the deliberations, and the Rimmer process, she repeatedly misstated the truth. She repeatedly failed to follow the court's order again and again and again. And she demonstrated that she could not be trusted at trial to be a impartial juror. For that basis, we believe my clients deserve a new trial. It's not the only Riemann and after Riemann failed entirely to adjudicate this case in a manner which allowed my clients to make their claim under the Rimmer standard. From the very first moments of the Rimmer hearing, when the court issued an order that was immediately violated by Juror 11, the most important juror in the whole process as the court well knew, and then hid that contact that Juror 11 had with ADA Nelson from us before the process, demonstrated the court was not sort of proceeding in the fashion which would allow us to adjudicate my client's rights, I think, effectively and fairly. How do you respond, counsel, to the fact that the judge said that he thought that the information should come directly from those individuals rather than as precedent? I don't think this court should credit it, and I think it's outrageously dismissive of the court's role in adjudicating these sorts of disputes. That was, I'll note, a post hoc explanation many, many months afterwards. It was not given in the moment. There was never any indication to us at that hearing that the court was waiting for us to stumble upon this topic of belief, frankly. I don't think it's consistent with what we know about the adversarial process or the court's role in it. I think one of the concerns in this case is whether you need to show actual bias on the part of Juror 11. Can you address that? Yes, I think that one, we think we've done that. I think that the actual bias is through repeated demonstrations that she's not truthful. This is consistent with the case in the Second Circuit, where the juror sort of repeatedly lied during the Rimmer process about what had gone on previously. Here, I think we've put in our opening brief, you know, seven different things that she did, both by violating the court's order and by lying on the stand. I mean, her testimony, you can go through it yourselves. You all will, I'm sure, have a great idea of the record, but the things she said were not credible. And by lying, I think it's an expression of actual bias. When you lie in process of a proceeding, that to me, I think this court can find actual bias. It doesn't need to find implied bias. But why does it show actual bias as opposed to showing a lying juror? Well, I think it shows actual bias, particularly because she noted it in the last time she testified, that she had told by ADA Nelson that the purpose of this hearing was to have the potential to overturn the conviction. And so by lying about what's happening, she has a motivation to prevent that from happening that is clear and apparent from the record. And so the bias is she's trying to prevent this conviction from being overturned. You rely on cases that where the bias or the dishonesty was found in attempting to acquire a seat on the jury. And that's not this case. Tell me why those would be applicable cases to our circumstance. Judge Trance, there is no case like this case. I will say that. And it's applicable because in that, those situations, I think the juror can be presumed to be lying to then carry out that continued sort of violation of the court's Here, because we have a juror who has expressed that she understood that this whole Rimmer process was about overturning the verdict, it can be, I think, equally applicable here, where her purpose for lying is to sustain the conviction. You know, what she was originally lying about and what she first had contact with ADA Nelson about was one to learn the purpose of the hearing. But then she comes and she testifies the first time, the very beginning of this, that she had no contact with And that we know is not true during the deliberations. And so I think those cases, they are different, but the sort of thread that flows through them is this is a juror who wants this conviction to be sustained. And so I think the same way that a juror who may want to get on a jury to do some damage to that judicial process can be applied to a juror who is trying to maintain a conviction. And was there anything more in your estimation that the district judge could have done to provide the Laniers with a meaningful opportunity to prove the bias claim? And I understand you say it's been proven, but let's assume, I mean, hypothetically, that there are questions about whether the court agrees with you. What more could the district court have done to provide that meaningful opportunity? Well, first, Judge Donald, when Juror 11, who was the key focus of this inquiry, immediately violated the court's order before the Rimmer hearing, he should have notified the parties and allow us to get access, for example, to the text messages beforehand. It would have changed the way we would have asked questions. It would allow us to sort of conduct a cross-examination potentially of Juror 11 more effectively. Two, once he knew that she had violated the court's orders, we would have been able to, at that point before the hearing, potentially subpoena and then preserve her web browsing history. I think the most likely concern we had was that she was researching the hearing. The purpose of researching the hearing would be to subvert it. And if we had access to that web browser history that showed she was researching things of that sort, we could confront her with that and then put forth that you had a juror who was misbehaving in those ways. After the hearing, he still waited months to allow us to do that, did not use a proper technical service provider. I mean, I think the court's decision to sui sponte, not inform the parties, to get the court's basically IT staff to take pictures of this, I mean, this panel's already commented on how that was improper. And then, you know, this juror, she kept violating the court's orders throughout this process. And no point did he say, you know, I know you violated my orders, please stop. He gave no sort of instruction to encourage her to follow his orders. So when she destroys, she loses the cell phone, she apparently tries to destroy the laptop. And she deletes the web browser history. She doesn't think there's a consequence for those things, because the courts allowed it to happen. So I think the question at bottom is whether your clients got a fair trial. And so shouldn't we be looking at what happened at trial to say, did did juror 11 deprive them of a fair trial through extraneous influences? Is that is that a proper question to be asking? I think it absolutely is Judge Moore. But I think that the way you answer that can absolutely look at rumor hearing conduct. You know, if you look at her actual testimony, just juror 11 testimony about what happened. She lied about it. She hid the contact with Nelson. She answers that question multiple times without revealing that. And then she does not fully represent what actually happened there. So if she's willing already to not be truthful about her conduct during deliberations, and then she engages in obstructive conduct later, I think the inference which this court recognized, I think in its September 2018 order, the inference at that point is that there were further obstructive behaviors that she is not allowing us to examine. It is does and how does that translate into actual prejudice? The Sixth Circuit is a a little bit of an outlier on what the standard is. So how do you argue that you meet the Sixth Circuit standard? And doesn't it require you to show actual jury partiality and prejudice? Yeah, I think that a juror who is unwilling to follow the court's orders, who then lies when confronted with the fact that she's violated the court's orders, is a juror who should not be sitting on a panel. And I think that's consistent with this court's precedent that even one juror who engages in external conversations about the case that are prejudicial, and here, I think they would be because she's now lied about them. So I think you have to infer that she did that purposefully. That demonstrates prejudice. And your honors, I know that time's up, but give me a moment. I think I recognize this question is a difficult one. And I think the prejudice here is it's the question is a difficult one to answer, but it's difficult because of Juror 11's actions and because of the actions of the district court. And the whole purpose of this line of cases is the understanding that defendants deserve a trial of jurors who are fair and impartial. That's the whole purpose of the Sixth Amendment protection. And I think when the public looks at a case like this, both in the way it was tried and the way the Rimmer hearing took place, an affirmation of this conviction would seriously undermine, I think, the public's belief in the criminal justice system because of the way it handled every step by this juror and by this judge. One quick question. The reading of the order indicated that your clients had been allowed out of jail after the initial order. Have they been remanded? They have not. They remain not. And that's a complicated question of what exactly the court had done by vacating the conviction, whether it could be reinstated pursuant to an order of the district court. We argued they couldn't. So they are currently on remand. Did they ever start serving their sentences? They are a spouse. And so the husband had served, I think, about a year while the initial appeal was pending. The prior appellate counsel had moved for bail pending appeal. It was denied. This court then, I think, reversed it about a year after he had served. And so he had served a year. When this case is decided, its convictions are reset. There's a question of sentencing, which we haven't talked about, that would have to be resolved. But they have not served any additional time besides the husband serving that year. Thank you. We'll hear from the government. Thank you, Your Honor. May it please the court, my name is Brian Samuelson and I represent the United States. The question on remand was whether any external influence affected jury deliberations. And here's what we know about that question. All 12 jurors testified that they were not exposed to any external influence and they did not know of any juror who was exposed to external influence. Teresa Nelson testified that she received a call from Juror 11, but they did not discuss any details of the case. And Juror 11 likewise testified that she called Nelson, but they did not discuss any and she did not mention the phone call during deliberations. Now, importantly, those counts are all consistent and they all corroborate each other. And they all point to the conclusion that there was no external influence that affected jury deliberations. I'm struggling a little bit with that because it seems that an external influence can be undertaken without speaking about what the external influence was. If the goal of this juror was to assure a conviction and then subsequently to hold that conviction, that juror didn't necessarily have to say, well, I've talked to somebody who knows this. That juror could have just made the most convincing arguments the juror could think of and attempting to sway the jury to make the determination that she desired. So I'm not sure that not speaking about what she did that was improper gets you off the hook. Well, Your Honor, two points. First, there is no evidence of any such external influence beyond the phone call to Teresa Nelson. And we have Teresa Nelson's own account of that call in which she says she did not discuss details of the case. Now, the case law in the Sixth Circuit is quite clear that the burden is on the defendant to prove actual external influence on the jury. So there is no presumption of external influence. In fact, the Orlando case says even a reasonable possibility of juror bias is not enough. There must be some evidence of actual juror bias or external influence. And there's simply no evidence in this case that Juror 11 did any other outside research during deliberations. Here's my concern about that. If Juror 11 had just violated the initial order and upon the decision of the court or the calling of the Rimmer hearing had then absolutely toed the mark, we might have a different case. My concern here is that this juror had violated the initial order and then, in the face of direct orders, continued to do so. Your opposing counsel argues that that's evidence that she was trying to maintain the verdict of guilty that had been found by that jury. Why doesn't that create a problem? Well, Your Honor, I think this case perfectly illustrates the importance of deferring to the District Court about credibility determinations because two people can look at this record and see very different things. Let me just back up one time. No two people can look at this record and not believe that this juror dissembled at least two times, probably three times, in violation of this court's order. Am I wrong on that? You know, you're gonna have to give me your position because it looks pretty clear to me that she violated more than one order. Yes, Your Honor, and the District Court, too, was clear-eyed about the fact that Juror 11 had not completely complied with the orders and, in fact, was not completely forthcoming when she was first asked about her contact with Nelson. Nevertheless, the District Court found her credible when she said she did not do any other outside research, and I think that is a credibility determination that is key and that this court owes substantial deference to because of the nuances in the way that testimony came to. Importantly, though, that testimony is not the only basis for concluding there was no external evidence. There was significant corroboration of her account in the record. You know, the other 12 jurors were asked whether anybody had any external influences, and that at least eliminates the possibility that there was some change in her position, they didn't observe anybody that came into deliberations and appeared to have done any so. Your Honor, to Judge Strange's point, in the record, doesn't it show that at least the court bailiff, I believe, reported that there was a pretty even division, you know, on one or more occasions with the jury, and then after a reasonably short period of time, and I believe this was after Jury 11 made her call that the other jurors didn't know about, that then the jury came to a unanimous decision on the case. Isn't that one of the facts that we're looking at in the record? And the reason I raise that is because, as Judge Strange says, there doesn't have to be any necessarily overt statement or action on behalf of Jury 11's conversation with the state's attorney, but there could be, you know, force of argument, line of reasoning, whatever, that could demonstrate that influence, and we simply don't know. You're asking us, on the one hand, to believe her when she says she didn't, but she's got these instances where she has been untruthful and dissembled in the record, and that's kind of a long, rambling statement and question, but you get where I'm coming from. Yes, Your Honor, and I detected two parts of that question, and I'd like to take them in turn. The first refers to an incident during deliberations that apparently the jury was divided, and then after they were unanimous, and the Remmer hearing discussed that and revealed some of why that might be. The foreperson said there was a juror, Juror 5, not Juror 11, who initially was reluctant to discuss a particular count. She had a talk with him. The next day, he came in, and he was willing to discuss that count, and they were able to reach a verdict shortly thereafter. So the juror explained why that apparent anomaly happened. As to your point about, I believe the other part of your question was that Juror 11 violated some of these orders and wasn't completely forthcoming. This is not a case like Dyer, like the Second Circuit case, like the implied bias cases, where a juror has been lying, concealing some relationship with the litigation to get on the trial. To the extent the implied bias doctrine even survives in the Sixth Circuit, it has been limited to those situations where there's a relationship with the litigation or the parties that would show some bias against the defendants. This is a juror who conceals that they had a relative who was murdered to get on a trial in a murder case. There's nothing like that here. There's nothing that suggests that Juror 11 had any interest in the parties, the litigation, or to fulfill her duty to consider the argument. But you know, the argument made by Mr. Little is that Juror 11 seemed to have manifested a desire to protect the guilty verdict. And you know, the right to the fair trial really belongs to the defendant. The court and the prosecutors have a role in helping to ensure that. But shouldn't we, I mean, it seems to me that this record raises some reasonable questions why a person might perceive, once they learn of this months later, that this had some influence and things did not happen as promptly as they should have, I guess, in the course of this whole trial. So I'm just wondering out loud here. And there's not really a real question in that, I guess. Yes, Your Honor. And I would just point out that the District Court saw this case very differently. Yes, it recognized that this was a person who made missteps. Yes, it took specific questioning until she talked about the Nelson phone call. But it found that was nevertheless that she was credible, that she was unbiased, that she was cooperative when presented with specific questioning. I mean, these are findings from the District Court who, through an extensive Rummer proceeding, was able to observe Juror 11 multiple times and found that testimony to be persuasive. And I think that is a finding that, as all credibility findings are, is the special province of the District Court. If the question is whether the defendants had a meaningful opportunity to show bias on the part of the juror, why isn't there a real problem with that issue of a meaningful opportunity, given the delay in having the Rummer hearing, the delay in notifying the defendants of the further contact on the part of the Juror 11 with the ADA, and then the failure to seize the telephone, the cell phone and the laptop, all of the events that transpired over a period of many, many months where seriatim, the Juror 11, was essentially acting to deceive and acting to conceal any search history on her devices that would show that she had been seeking extraneous information during the course of the trial, during the course of the Rummer hearing, etc. Yes, Your Honor, and a meaningful opportunity does not mean a perfect opportunity. So, I believe there has to be more than showing that things could have been better. There has to be a deprivation of a meaningful opportunity to prove bias. And the defendants here had that. Let me take the issues you highlighted in turn. You mentioned the delay in the Rummer hearing, but this Court has previously held that delay alone is not enough to render a Rummer hearing insufficient. That's the Corrado case. You mentioned the District Court's failure to notify the parties about the text messages to Nelson before the hearing. It would have been preferable for the Court to notify the parties, absolutely, but Nelson testified almost immediately at the hearing about those text messages. Those text messages were recovered from her phone at the hearing. The defendants had an opportunity to cross-examine. Isn't it a very different thing for someone to come into that kind of hearing and there be told that something else has gone on versus what your opposing counsel suggests that he may have come in with different questions and different thoughts and different research had he been told before that this was continuing to go on? Yes, Your Honor. I would point out that at the Rummer hearing, Juror 11 was called. She was removed from the stand. There was a lunch break taken. The texts were retrieved from Nelson's phone, and then Juror 11 was recalled to the and Juror 11 was called to testify under oath months later at the end of the Rummer hearing proceedings, where again, she was subjected to questions about her preservation of data and her contact about the Rummer hearing. So there were multiple chances to broach those issues with Juror 11. And then with regards to collection of her devices, she did turn over her devices to the court. The court performed a visual inspection, which again was not ideal, but it was far from worthless. In particular, the cell phone had web browser history from the period before the Rummer hearing. It had text messages from before the Rummer hearing, including the text messages from Nelson that the court could compare and see that they were exactly the same. Nelson was cooperative in the fact that she gave over her account passwords so that search of the data on Google servers could be could be performed. You said Nelson, but you mean Juror 11, right? I'm sorry, Your Honor. I did mean Juror 11. So I thought that the password, she gave the wrong password so that it couldn't actually be found. Initially, she gave the wrong password, but then she was contacted about that, and she gave the updated correct one. And then there was a problem that various things had been deleted. No, Your Honor. I believe that it is true that the Google takeout didn't reveal any useful information, but I don't think there was any evidence that she had deleted anything from that. It just wasn't set to record, is my understanding of that issue. Okay. Is that significantly different if it wasn't set to record? Well, it is to the extent that we're trying to infer some deliberate attempt to record to conceal information, which the district court did not find, and I don't think there is any evidence of in this record. Surely you have to agree that this is a very suspicious record. Well, I think there are factors weighing both ways. I think in many ways she was cooperative and helpful, and in other ways she did not comply with the orders and was not deferred to a district court to make a credibility finding about whether this person was an unbiased juror and whether there was actually any external influence on the jury. There was an ample opportunity to plumb those issues. There was no evidence of external influence that the district court found. And on those facts, I would urge the court to affirm. I have a question about the district judge's decision to meet independently and ex parte with the expert that he had chosen. Tell me how that can possibly be appropriate. Well, Your Honor, that is something this court has already found, has already remarked that it prepared his report of the computer. He examined the computer. The defendants had an opportunity to examine him under oath after that examination. All that was after the defense had said, here is how we want to examine this record. And the judge calls in the appointed expert, discusses what sort of investigation should be undertaken ex parte, then rules to go with what was evidently decided at that meeting with the expert ex parte. And I understand the judge gets to rule on what is the best way and what is the way he or she is going to allow items to be examined. But how can that be done in an ex parte meeting with an expert by the court? Significantly, the defendants did not seek any further forensic examination of that computer. So to the extent they had any problem with how that forensic examination was conducted, they did not seek another examination of the computer or allege that that expert did anything. Remind me of the date that all parties were told that the judge had met ex parte with the expert. I believe that revelation came through an invoice to the defendants. That was May of 2018. But the evidentiary, okay, May of 18. Right. Yeah. 5-16 of 18. There it is. But that was, but the determination had already been made as to how the devices would be examined. Right? Well, Your Honor, the expert report was filed later and the hearing about that report was many months later. And after that was when the defendant said they requested no further forensic examination. So they expressed their satisfaction with the expert report after they had learned about the court's contact with the expert. Okay. Any further questions? Let me make sure I'm right. 5-16 is when the invoice reveals the ex parte communications or the date of the ex parte communications. I believe that is the date of the invoice. So what was the date of the ex parte communications? Your Honor, I don't know that information off the top of my head. I'm not 100, I don't want to misstate the record, but I'm not sure that the invoice said a specific date. Okay. Thank you. Thank you. Rebuttal? Yes, Your Honor. Let me just correct sort of two parts of the record. With respect to the Google takeout, the testimony from the defense expert was that it had to have been manual. There was nothing there that generally, as soon as you open a Google account, it would collect search data. So you would expect some search data to be there. That was not there. And at some point it had been switched from kind of collection, which was the default, to not collecting that information. All of that could have been done in the time between the two different passwords being given. But it certainly was the testimony of the expert that that was missing and should have been there. That also came on the heels of the court appointed experts saying that the web history, which she was ordered to maintain, had been manually deleted and that she was the primary user. And so there already had been a fine. So to respond to the government's question, we didn't ask for a second forensic exam. It was because the stuff had been deleted. There was nothing to be found. We had no reason to doubt that it could not be. In fact, we suggested to the court the Google takeout procedure, hoping it might be on the cloud somewhere, and that was fruitless as well. I think all of this, though, to take it back to the very beginning, is the testimony of ADA Nelson was not that there was not external, or not there was sort of, this was not a big deal. It was that the juror had called and said that there's some problems, some issue happening, and I need to know what to do. It was an ask. That's Nelson's testimony. It's 6994 of the record that she was asking for what to do. Now, Nelson did not give her that information, or at least testify that she did not give her that information. What we don't know is what other steps Juror 11 took during deliberations to answer that question for herself. The meaningful opportunity for us to examine that was what the Rimmer hearing was supposed to provide, and when Juror 11 then, at every step of the process, obfuscated and obstructed, our clients were deprived of the opportunity to determine what that was, what the prejudice was. So I think there is a very clear line to our clients being denied a meaningful opportunity to make their claim. With respect to the credibility determinations, I think it is often important to tell judges plainly what you think happened. I think here the record is best read as a district court judge who, from the moment this issue was raised at trial, through the end of the Rimmer process, was dead set on affirming this conviction. If you go back to his original order, this is, you know, after he has refused to tell the parties, the defendants, about this misconduct by the very juror at issue, the issues and order on January 26th, denying any subpoena of Juror 11 whatsoever. And he does that because he says, I believe her, notwithstanding the fact that she's multiple times changed her testimony that day. And then he says, well, even if her original statement, for example, one of the things she testified about Nelson was made with an intent to deceive, she later corrected her statement in the same proceeding, so it's not perjury. He set this standard somehow that so long as she did not perjure herself, it was okay. We only started to go down this path once we filed the emergency writ of mandamus to ask for any discovery whatsoever. So I think it's difficult to see this kind of fact-finding process as anything other than every time the defendant sought to actually examine the credibility with some corroboration, it was denied. We then had to take that up on given and then not given. That is what this case looked like procedurally. And I think if that's not a mismanagement of the fact-finding process, I can't imagine of a worse one. And so I think for my client... Do you have any cases that would show that it is a worthy of mistrial for a judge to meet ex parte with an expert or fail to provide the kinds of information that you think were necessary? Your Honor, we look for cases like that, and I can tell you we've not found a single case or a judge. There were cases with experts, and we put those before you on the motion to recuse, which was in September of 2018, as to why that should have been a basis for recusal. That's in that briefing. There was, I think, one case discussed where the First Circuit did recuse on that basis, but the issue that came up wasn't the mistrial. It was the recusal. And so there was a different set of questions, but that First Circuit case does discuss why it's a problem. I think there is nothing like this case where a district court judge, before opening a rimmer hearing to decide whether a juror has acted improperly, is given information that that juror has acted improperly and refuses to provide that to the defendants. This is the first case like that. It violates all principles of due process, and we think that alone demonstrates that there was a denial of the opportunity to prove our claims. Unless the Court has other questions, we'll rest on our briefs. Thank you both for your argument, and the case will be submitted.